IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) 2:16-cr-196 |
| | ) |
| JAMES FRANCE, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

In the early morning hours of July 29, 2016, officers from the Scott Township (PA) Police Department responded to a 9-1-1 call alerting them to a possible home invasion at a residence owned by Defendant James France. When they arrived, the officers were met by an individual who told them that six (6) shotgun-toting men were inside the house. After a knock and announce failed to draw anyone from the house, officers entered the home. But instead of six (6) armed invaders, the officers encountered two (2) people sitting on a bed upstairs, a substantial quantity of methamphetamine, a litany drug paraphernalia, and indicia bearing France's name. Based on their observations during a protective sweep of the home, the officers obtained a warrant to further search the residence. The fruits of that warrant led a federal grand jury to indict France and two (2) co-defendants.

France moved to suppress all of the evidence collected from his residence on grounds that the officers' initial warrantless entry into his home violated his Fourth Amendment rights. The Court held a hearing on the matter and the parties fully briefed the issues. For the reasons that will follow, France's Motion to Suppress is DENIED.

1

## I. BACKGROUND

On September 13, 2016, a federal grand jury indicted France on one (1) count of Conspiracy to Distribute and Possess with Intent to Distribute Fifty (50) Grams or More of Methamphetamine, 21 U.S.C § 846, and one (1) count of Possession with Intent to Distribute Fifty (50) Grams or More of Methamphetamine, 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). (Indictment, ECF No. 1.) Then, on January 25, 2019, France moved to suppress the evidence uncovered during the execution of a search warrant at his residence. (Mot. to Suppress, ECF No. 172.) The Government filed its response to France's Motion to Suppress on March 15, 2019. (Gov't Resp., ECF No. 180.) Shortly thereafter, on May 14, 2019, the Court held a hearing on France's motion and later ordered post-hearing briefing from the parties. (ECF Nos. 188 and 189.) France filed his post-hearing brief on July 16, 2019. (Def.'s Post-Hr'g Br., ECF No. 194.) The Government filed their response on August 28, 2019. (Gov't's Post-Hr'g Br., ECF No. 195.) Then France filed his reply on September 14, 2019. (Def.'s Post-Hr'g Reply, ECF No. 198.) With post-hearing briefing complete, the Court can decide France's motion.

## II. FACTUAL FINDINGS

On a motion to suppress evidence, the trial judge sits as the finder of fact. *See, e.g.*, *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012). Therefore, it is for the trial judge to assess the credibility of the witnesses, weigh the evidence, and reach any "inferences, deductions and conclusions to be drawn from the evidence." *Id.*

At the suppression hearing held on May 14, 2019, the Government called Scott Township Police Officer Shane McGrath to testify and proffered testimony from Scott Township Police Chief Thomas Dunlevy. (Hr'g Tr., ECF No. 191, at 2, 92:19–96:9.) Although the Government proffered Chief Dunlevy's direct testimony, France's counsel briefly cross-examined Dunlevy, and the

Government followed up with redirect examination. (*Id.* at 101:8, 103:15.) The Court finds Officer McGrath's testimony, and Chief Dunlevy's proffered testimony and his testimony on cross and redirect examination to be credible. Here is what happened on the night in question.

The vast majority of the testimony during the hearing came from Officer McGrath.[1] At 1:38 AM on July 29, 2016, Officer McGrath was on a routine patrol as a K-9 officer in Scott Township, Pennsylvania. (*Id.* at 19:13–15.) At that time, he received "a call for service for a burglary in progress . . . where it was reported that there were six black males attempting to break into a residence with armed shotguns" on Bower Hill Road in Scott Township. (*Id.* at 19:20–24.) Four (4) officers, including Officer McGrath, simultaneously responded to the scene of the reported home invasion. (*Id.* at 43:24–24:1.) Officer McGrath knew from experience that the site of the alleged home invasion is a "kind of congested" residential area. (*Id.* at 20:2–10.)

The residence itself was a single-family home situated on Bower Hill Road, which has two (2) lanes running in each direction. (*Id.* at 45:3–13.) The home had a small driveway leading to a garage attached to the basement level of the home. (*Id.* at 45:22–46:4, 68:1–13.) In addition to the basement, there were two (2) main floors of the home. (*Id.* at 49:11–15.) The front door to the home was elevated above the sidewalk, and there were three (3) or four (4) steps leading from the sidewalk to the front door. (*Id.* at 68:9–69:9.) Viewing the residence from the front sidewalk on Bower Hill Road, the home's roof was pitched from left to right in a triangular shape. (*Id.* at 69:19–70:17.)

---

[1] Officer McGrath has been employed by the Scott Township Police Department since 2006. Prior to that, he worked as a police officer for the Borough of Carnegie from 2001 to 2006, the Borough of Ingram from 1999 to 2001, and Rosslyn Farms Borough for a "short stint" of approximately ten (10) months from 2000 to 2001. Before beginning his career as a police officer in Western Pennsylvania, Officer McGrath served eight (8) years in the United States Marine Corps as a military police officer. (Hr'g Tr., ECF No. 191, at 16:6–17:3.) During his time with the Scott Township Police Department, Officer McGrath "trained as a police officer for the District Attorneys Narcotics Enforcement Team," and "worked on multiple investigations involving narcotics." (*Id.* at 17:5–13.) Officer McGrath also served as a K-9 handler from 2008 to 2017, during which he received extensive training. (*Id.*)

3

When he arrived at the residence, Officer McGrath "encountered a male outside the residence who was the apparent caller." (*Id.* at 20:21–22.) The man's "name was Mark Huellen" ("Huellen"). (*Id.* at 20:22.) As McGrath approached, Huellen was standing "[o]n the front sidewalk closest to Bower Hill Road away from the house," still "on his cell phone with the dispatchers." (*Id.* at 21:13–14, 69:15–18.) Referring to the home invaders he reported in his 9-1-1 call, Huellen told Officer McGrath "that these males were in the house, trying to get in with shotguns." (*Id.* at 20:22–24.) Huellen further stated that "[t]hey were on the roof ... trying to get in through the door." (*Id.* at 20:23–25.) And Huellen warned that the armed men "were still in the residence." (*Id.* at 21:1–2.)

When Officer McGrath encountered Huellen, he noted that Huellen was "[u]pset, very excited like you would be if you were experiencing a traumatic event where someone is trying to harm you." (*Id.* at 21:4–6.) Huellen was wearing jeans and a white shirt, and Officer McGrath testified that he remembered that Huellen was not wearing shoes or socks despite it being a relatively cold night. (*Id.* at 21:8–10.) When asked on cross examination if he could tell whether Huellen was under the influence of narcotics, Officer McGrath testified that he did not have much time to assess Huellen's physical state since he was primarily focused on the potential threat of six (6) armed men inside the residence.[2] (*Id.* at 47:1–18.)

After "quickly" talking with Huellen, Officer McGrath and three (3) other officers

---

[2] On direct, Officer McGrath was asked: "At some point in your report [did] you write that Mr. Huellen was hallucinating." (*Id.* at 39:12–13.) Officer McGrath responded:
> Well, when we get there initially, [Huellen] is our caller, he is our complainant. He is telling us what is happening. He is very upset, excited about it. He is scared. He is in fear of armed suspects. Once we secure the residence and do not locate armed suspects, it's not to say they weren't there but after talking to him, one would believe possibly that he might have been hallucinating but I am not an expert in that field.

(*Id.* at 39:15–23.) But Officer McGrath's determination that Huellen *might* have been hallucinating did not come until after officers entered and swept France's residence in search of the armed men Huellen reported, but found none.

4

approached the house. (*Id.* at 21:23–22:7.) The back of the residence was "very dark" and there was "a back porch that ha[d] . . . drapery covering the back." (*Id.* at 22:12–22.) Because of the drapery, the officer "couldn't see into the residence." (*Id.*) Officer McGrath also testified that the officers were focused on the "back roof because [Huellen] said people were trying to get into the house through the roof." (*Id.*)

In the front of the house, however, Office McGrath observed that the front door was "wide open" and "lights were on in the residence." (*Id.* at 22:18–23:2.) The officers approached the open front door and yelled in: "Scott Township Police, announce yourself, anyone in the residence." (*Id.* 54:1–6.) The officers received no response from anyone in the home. (*Id.* at 23:8–9.) As they were at the open front door, however, Officer McGrath "hear[d] music from the upstairs but [h]e couldn't determine exactly where it was coming from." (*Id.* at 23:10–14.)

Having received no response to their knock and announce, and still believing that there may be armed individuals inside, the officers then entered the house. (*Id.* at 23:23–24:8.) Officer McGrath and Officer Helf—another Scott Township police officer—"entered into the right of the doorway." (*Id.*) "There was a small room to the right" when they entered, and the officers "visually looked [into the room] and [saw] there were no threats." (*Id.*) In the entryway to the residence there was also a stairwell leading up to the second level of the home. (*Id.* at 24:4–12; Gov't Ex. 1.) And at the top of the stairway was a closed door. (ECF No. 191, at 25:5–12.)

Officers McGrath and Helf ascended the stairwell in order to secure it and then attempted to clear the upstairs, while the other two (2) officers went to clear the living room and dining room area of the house. (*Id.* at 24:4–8.) Officers McGrath and Helf, as they approached the closed door at the top of the stairwell, "could hear music playing." (*Id.* at 25:13–24.) They "again announced Scott Township Police" but did not receive a response. (*Id.*) But for officer safety reasons—since

5

an armed suspect "could be hiding behind [the] door"—they did not knock on the closed door at the top of the stairs. (*Id.* at 26:1–12.)

Once Officers McGrath and Helf reached the top of the stairs, Officer McGrath opened the door—to what turned out to be a bedroom—and observed "two males on the bed."[3] (*Id.* at 27:3–6.) One of the males on the bed was Caucasian, and the other was African American. (*Id.* at 27:10–15.) The officers then identified themselves and ordered the two (2) men to put their hands up. (*Id.*) But instead of complying, "[t]he one African American actor attempted to reach for a bag on the bed" despite being told multiple times not to move. (*Id.*) As a result, the officers "secured him forcefully." (*Id.*) After securing the individual, Officer McGrath "could see open in plain view there was a handgun in" the bag the man reached for. (*Id.* at 28:6–10.) There were also "multiple pipes and drug paraphernalia in the residence or in that bedroom." (*Id.*) Because of this, both of the men found in the bedroom were placed in custody. (*Id.* at 28:12–13.)

Securing the suspects in the bedroom, however, did not conclude the officers' protective sweep of the house. (*Id.* at 27:19–28:6.) Based on Huellen's report, the officers were looking for six (6) individuals, but only two (2) were located in the upstairs bedroom. (*Id.*) Officer McGrath, therefore, concluded that they were "still looking for four others, specifically at least five other black males." (*Id.* at 28:1–2.) So Officers McGrath and Helf secured "the firearm for safety but . . . did not seize anything." (*Id.* at 28:11–29:5.) The officers placed the two (2) suspects, then in custody, in the upstairs hallway under the watch of Officer Scott—another member of the Scott Township Police Department. Officers McGrath and Helf then finished sweeping the bedroom for other threats to officer safety, but found no additional suspects. (*Id.*)

---

[3] The two (2) men in the upstairs bedroom were later identified as Charles Outcalt ("Outcalt") and Nathan Haskins ("Haskins"), who are France's co-defendants in this case. They have each entered pleas of guilty. (ECF Nos. 128, 142.)

6

Still in search of potentially four (4) or five (5) more suspects, the officers "proceeded to clear the rest of the residence upstairs." (*Id.* at 29:6–14.) This included sweeping "a master bedroom and a bathroom upstairs." (*Id.*) But the officers did not locate any further suspects in the upstairs portion of the residence. (*Id.*) At this time, the officers brought the two (2) suspects downstairs where they remained in custody. (*Id.* at 29:15–20.)

With the upstairs cleared, the officers began sweeping the first floor for any additional suspects. (*Id.* at 29:4–13.) During their sweep, the officers noted that the residence was cluttered with bags, boxes, and other random objects covering almost every surface. (*Id.*; Gov't Exs. 2–4.) Included in this clutter was drug paraphernalia, including "smoking glass pipes," "a digital scale," and a butane torch (ECF No. 191, at 32:5–34:2; Gov't Exs. 3–7.) The officers worked their way to the basement of the home which they swept for threats, and did the same as to a "hidden room in the basement." (ECF No. 191, at 34:21–35:11.) There, the officers confronted what appeared to be containers with chemicals in them. (*Id.*) Most notably, however, was the pungent odor that permeated the basement area of the home. (*Id.*) Officer McGrath testified that, based on his training and experience, he recognized the smell to be associated with methamphetamines. (*Id.*) The protective sweep concluded without locating any suspects beyond the two (2) men found in the upstairs bedroom.

During the protective sweep, Officer McGrath observed "so much white powder"—which he assessed was either methamphetamine or cocaine—that he "would not want to bring [his] K-9 partner through th[e] residence for the fear [the K-9] would overdose on the amount [of white powder] that was in th[e] residence in plain view." (*Id.* at 35:14–20.) So concerned were the Scott Township officers about the amount of apparent methamphetamine in the residence that they reached out to a contact at the Drug Enforcement Administration ("DEA")—Task Force Officer

7

Thomas Dunlevy ("TFO Dunlevy")—to inquire whether they stumbled upon a "possible meth lab." (*Id.* at 35:25–36:7.) TFO Dunlevy arrived on the scene at approximately 3:00 AM and conducted a walkthrough of the residence. (*Id.* at 38:15–39:9.)

When TFO Dunlevy "completed his walkthrough, he advised [Officers McGrath and Helf] that he believed . . . it was safe to go back in[side]" the house."[4] (*Id.* at 39:7–9.) Up until this point, Officer McGrath's observations inside the home came while he conducted a protective sweep with the "purpose . . . to clear the residence for armed suspects." (*Id.* at 38:13–14.) The officers' priority was to "secure the[] six black males that might still be hiding in another room upstairs." (*Id.* at 74:3–9.) Their objective was not to search for evidence. (*Id.* at 38:9–13.) While TFO Dunlevy conducted his walkthrough to ensure the residence was not an active meth lab, Officer McGrath prepared an affidavit for a warrant to search the residence. (*Id.* at 39:10–11.) A magistrate judge issued the search warrant based on Officer McGrath's affidavit detailing the large amount of suspected methamphetamine or cocaine and drug paraphernalia that he observed in plain view during his sweep of the home. (*Id.*; Def.'s Ex. A., ECF No. 172-1.)

Armed with a search warrant, and having received the "all clear" from TFO Dunlevy's walkthrough, Officer McGrath and other members of the Scott Township Police Department reentered the residence to search for evidence of drug offenses. (ECF No. 191, at 40:5–13.) The officers "obtained multiple glass piping objects commonly used to smoke or inhale illicit drugs," as well as "two safes that had money" in them, and "indicia identifying the homeowner" as Defendant James France. (*Id.* at 40:10–15.) The officers also "located two large containers . . . full

---

[4] As noted earlier, during the suppression hearing the Government proffered the direct testimony of Chief Dunlevy— who was TFO Dunlevy on July 29, 2016. (*Id.* at 96:10–9:24.) The proffered testimony consisted primarily of then-TFO Dunlevy's observations as he conducted a safety walkthrough of the Bower Road Residence to ensure that it was not an active meth lab. (*Id.*) His observations were consistent with those of Officer McGrath as to the readily and abundantly apparent narcotics and paraphernalia overserved in plain view throughout the home. (*Id.*)

8

of, common terminology, crystal meth." (*Id.* at 40:15–21.) As Officer McGrath put it: "There was an abundance of [methamphetamine]. . . . It was a lot." (*Id.*) Officer McGrath also seized the firearm that he earlier found in the bag that was on the bed with Outcalt and Haskins in the upstairs bedroom. (*Id.* at 40:22–41:2.) Later, TFO Dunlevy contacted the homeowner, James France, to request that he come to the residence. (*Id.* at 41:16–23.) France, however, "never showed up." (*Id.*)

Based on the evidence collected when Scott Township police officers executed the search warrant, a federal grand jury indicted France on two (2) drug-related counts. (Indictment, ECF No. 1.) A warrant was later issued for France's arrest. (Order, ECF No. 6.) Police eventually arrested France, and Magistrate Judge Robert Mitchell arraigned France in this District on September 21, 2016. (Magistrate Judge's Report on Arraignment, ECF No. 20.)

## III. DISCUSSION

France's Motion to Suppress (ECF No. 172), and post-hearing briefs (ECF Nos. 194 and 198), seek two (2) forms of relief. First, France seeks to suppress any physical, documentary, and testimonial evidence related to a warrantless search of his residence. (ECF No. 172, at 8.) Second, France asks the Court to suppress any evidence gathered by the officers when they executed the search warrant at his residence. (*Id.*)

When a defendant moves to suppress evidence, he bears the initial burden of establishing a basis for his motion. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013). The defendant's burden is easily satisfied when law enforcement conducted the challenged search without a warrant. *Johnson*, 63 F.3d at 245. The burden then shifts to the Government to prove by a preponderance of the evidence that the officers conducted the warrantless search in a manner consistent with the Fourth Amendment. *Id.* at 245; *see also United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (noting the

9

preponderance of the evidence burden placed on the Government).

Distilled down to their core arguments, France's motion and briefs largely rely on the assertion that Huellen was such an obviously unreliable witness that his report of six (6) armed men in the residence should have been automatically discounted by police. The consequence being that, if Officer McGrath and the other Scott Township police officers discredited Huellen's report—as France asserts they properly should have—then the officers did not have a lawful basis to enter France's residence on July 29, 2016.

From where the Court sits, this case serves as a reminder of the often uncertain situations that law enforcement frequently encounter. When responding to a 9-1-1 call that six (6) armed men invaded a home in the dead of night, law enforcement would fail the public they have sworn to protect if they slowly dissect every fact before them rather than move expeditiously to quell what could be a very real threat to human life—all in a fashion consistent with Fourth Amendment protections and principles. For reasons that are set out in greater detail below, the Court concludes that they did just that here, and France's motion is in all respects denied.

## A. **The Emergency Aid Exception**

In relevant part, the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Warrantless entry into a home is the chief evil that the Fourth Amendment is meant to protect against. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

But there are exceptions to the general rule that law enforcement must obtain a warrant

before entering a home. One such exception is the so-called "emergency aid exception," which arises when circumstances lead law enforcement to reasonably believe that people inside a home are threatened with imminent injury. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)) ("[L]aw enforcement officers may enter a home without a warrant to . . . protect an occupant from imminent injury."). The test is "whether there was 'an objectively reasonable basis for believing' that . . . persons were in danger."[5] *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam) (quoting *Stuart*, 547 U.S. at 406). Importantly, though, officers need not possess "ironclad proof" in order to satisfy the requirement that they have an objectively reasonable basis to believe an emergency is ongoing. *Id.* And a court should not substitute its hindsight determination of the actual emergency status, for that of the on-the-ground officer responding to the situation in real time. *Id.* ("It was error for the [lower court] to replace th[e] objective inquiry into appearances with its hindsight determination that there was

---

[5] In *Stuart*, the Supreme Court treated the "emergency aid exception" as a subset of the broader "exigent circumstances exception" to the Fourth Amendment's warrant requirement. *See Stuart*, 547 U.S. at 403–04. With regards to the broader category of exigent circumstances, our Court of Appeals has long held that both "probable cause *and* exigent circumstances [must] exist to justify" a warrantless entry into a home. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (emphasis in original) (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981)). But in *Michigan v. Fisher*, the Supreme Court clarified that the narrower "'emergency aid exception' . . . requires *only* 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid . . . .'" *Fisher*, 558 U.S. at 47 (alteration in original) (emphasis added) (internal citations omitted). Whether *Stuart* obviates the need to prove probable cause when it comes to the emergency aid exception or instead means that the objective basis test automatically satisfies the probable cause requirement strikes the Court as more semantics than substance.

The Third Circuit has not yet opined on the impact of *Fisher* in a precedential decision. *But see United States v. Wolfe*, 452 F. App'x 180, 183 (3d Cir. 2011) (citing pre-*Fisher* case law for the proposition that both probable cause and exigent circumstances are needed, but concluding that the objective basis test set out in *Stuart* satisfies the Fourth Amendment). But several other courts of appeals have held that, in light of *Fisher*, a court need not undertake a separate probable cause inquiry when examining the emergency aid exception. *Hill v. Walsh*, 884 F.3d 16, 19 (1st Cir. 2018) ("[Officers] do not need to establish that their belief approximated probable cause that such an emergency existed."); *United States v. Quarterman*, 877 F.3d 794, 800 (8th Cir. 2017) (citing *Fisher*, 558 U.S. at 47) ("If officers have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves, they do not also need probable cause."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 560 (7th Cir. 2014) ("[T]here [is] no logical need to additionally consider probable cause and the availability of a standard criminal warrant."); *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) ("Officers do not need probable cause if they face exigent circumstances in an emergency.") (quoting *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1075 (10th Cir. 2010)); *United States v. Timmann*, 741 F.3d 1170, 1178–79, 1178 n.4 (11th Cir. 2013). In the Court's estimation, then, the Supreme Court's holding in *Fisher* should be read to mean exactly what it says: Only an objectively reasonable basis for believing there is an emergency inside the home is needed to justify warrantless entry.

in fact no emergency.").

Here, as a threshold matter, the Court easily concludes that France met the initial burden of establishing a basis for his motion. *See Johnson*, 63 F.3d at 245. There is no dispute that the officers' initial entry into France's home occurred without a warrant. Therefore, the burden shifts to the Government to prove by a preponderance of the evidence that the officers acted lawfully when they entered France's home. *See Lowe*, 791 F.3d at 432 n.4; *Johnson*, 63 F.3d at 245. The Court concludes, based on the arguments set out in the Government's briefs and the testimony from the suppression hearing, that the Government has met its burden.

Officer McGrath and his colleagues possessed an objectively reasonable belief that there was an ongoing emergency inside France's Bower Hill Road residence. Police received a dispatch at 1:38 AM alerting them to a possible armed home invasion. (ECF No. 191, at 19:13–24.) Officers responded to the scene where they were met by the 9-1-1 caller—a man who was visibly shaken, and who told the officers that six (6) men with shotguns were inside the home. (*Id.* at 20:21–21:2.) The front door to the home was wide open, and the caller appeared to not be wearing shoes or socks, consistent with his having fled the house in a big hurry. (*Id.* at 21:8–10.)

All of these facts are consistent with a man who saw multiple armed individuals attempting to enter his residence, causing the man to flee for his life out the front door and dial 9-1-1 for help. From this, the officers had an objectively reasonable basis for believing that there was an ongoing, imminent threat inside the residence. That is all the Constitution requires of officers before they can make a lawful warrantless entry into the home. *See Fisher*, 558 U.S. at 47; *Stuart*, 547 U.S. at 403–04. The officers did not need "ironclad proof" that the emergency was real, just an objectively reasonable belief under the circumstances. *Fisher*, 558 U.S. at 49.

France argues that the officers should have either immediately known Huellen was unwell,

and inferred therefore that his report should be discredited, or should have questioned Huellen at greater length before entering the home. (ECF No. 194.) Neither argument is persuasive. The suggestion that the officers should have immediately discredited Huellen's report is wrong for two (2) reasons. First, Officer McGrath credibly testified that when he arrived at the Bower Hill Road residence Huellen appeared "[u]pset, very excited like you would be if you were experiencing a traumatic event where someone is trying to harm you." (ECF No. 191, at 21:4–6.) From Huellen's reaction, Officer McGrath reasonably believed that Huellen was being truthful about the home invasion. And the fact that Huellen was upset, Officer McGrath could reasonably infer, was not because Huellen was under the influence of narcotics or other drugs, or was otherwise unwell, but rather because he just suffered the traumatic experience of watching six (6) individuals with shotguns trying to enter his residence.

Second, France's argument that Huellen's demeanor should have led police to immediately ignore his report fails for the simple reason that two (2) things can be true at the same time. It is possible that Huellen *was* under the influence of narcotics or drugs. But it is also true that someone who is under the influence of narcotics or drugs can have his or her home broken into by multiple armed intruders. France wholly fails to explain why these two (2) concepts are mutually exclusive, and in the Court's estimation they are not.

The Court also rejects France's argument that the officers should have spent more time questioning Huellen before they entered the residence. Police officers are not required to conduct a mini-psychiatric exam of a complaining witness they encounter who alleges a middle-of-the-night armed home invasion. Some situations require that the responding officers act quickly. This is especially true when the circumstances—view objectively—suggest that there is an ongoing dangerous emergency. France would have officers responding to the scene of a reported home

13

invasion—where up to six (6) individuals were armed with shotguns—stop and thoroughly interrogate the witness, inspecting the minutia of his report and dissecting his demeanor. That is not what the Constitution requires in these specific circumstances.

For the above reasons, the Court concludes that the Scott Township police officers who responded to France's home reasonably believed that there was an ongoing emergency inside the residence that posed a genuine and imminent threat to human life. Their warrantless entry into France's residence, then, fully comported with the requirements of the Fourth Amendment.

### B. <u>The Protective Sweep</u>

Once officers are lawfully inside a home, they may conduct a limited search of the residence to ensure officer safety—commonly referred to as a "protective sweep"—under certain circumstances. "A protective sweep is without question a 'search' [and is] permissible on less than probable cause only because [it is] limited to that which is necessary to protect the safety of officers and others." *Maryland v. Buie*, 494 U.S. 325, 336 n.3 (1990) (internal citation omitted); *see generally United States v. White*, 748 F.3d 507 (3d Cir. 2014). The limited search extends only to areas where an assailant may be hiding in wait. *See Buie*, 494 U.S. at 336. And it cannot last longer than is needed to quell the officer's reasonable fear of danger. *See id.* at 335–36.

In *Maryland v. Buie*, the Supreme Court articulated two (2) situations when a protective sweep is permissible under the Fourth Amendment. The first prong of *Buie* allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" as part of a search incident to a lawful arrest inside the home. *Id.* at 334. Because *Buie*'s first prong is premised on the existence of a lawful arrest, there is no requirement that police provide probable cause or reasonable suspicion for their precautionary sweep of the home. *Id.*

The second prong of *Buie*, however, requires more of a showing from law enforcement. Under *Buie*'s second prong—in which there is no lawful arrest accompanying the sweep—law enforcement must provide "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* A "reasonable and articulable suspicion," however, is considerably less of a showing than what is required for probable cause. *White*, 748 F.3d at 511 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Thus, when the officers conducted an "individualized assessment of the situation present and actually reasonably believed that the facts as they knew them warranted a protective sweep," then their conduct comported with the Fourth Amendment. *United States v. Howard*, 144 F. Supp. 3d 732, 745 (W.D. Pa. 2015).

Here, the Court's first task is to determine whether the Scott Township police officers' search of France's home fell within the limited scope allowed under *Buie*. After all, if the officers went beyond searching for potential assailants and instead began searching for evidence to use against France, then suppression would be warranted. *See Buie*, 494 U.S. at 336. But here, the Scott Township officers stayed within the limited bounds of a protective sweep.

During his testimony, Officer McGrath stated that the purpose of the protective sweep was to "clear the residence for armed suspects" (ECF No. 191, at 38:9–14, 74:3–9.) It was not to gather evidence. (*Id.* at 38:9–14.) When Officers McGrath and Helf encountered Outcalt and Haskins in the upstairs bedroom, Officer McGrath secured the firearm found on the bed but did not seize it. (*Id.* at 28:10–16.) And as the officers moved throughout the rest of the house searching for the armed intruders, they observed suspected methamphetamine and drug paraphernalia but did not seize anything or search beyond what they could readily see in plain view. There was no testimony

15

that the officers opened kitchen drawers, peeked in cupboards, or took any other actions that would constitute a more invasive search than what is allowed under the protective sweep exception. The Court finds Officer McGrath's testimony credible on the scope of the protective sweep—and in all other aspects—and concludes that the Scott Township police officers protective sweep was properly limited to search for hidden dangers, not evidence.

The Court's next task is to decide which *Buie* prong should be used to analyze the Scott Township police officers' protective sweep of France's residence. *Buie*'s first prong only applies when the protective sweep follows a lawful arrest. *See Buie*, 494 U.S. at 334. Here, the record is unclear on exactly when the officers placed Haskins and Outcalt under formal arrest. While Officer McGrath testified that Haskins and Outcalt were in "custody" after he and Officer Helf initially found them in the upstairs bedroom, the record does not reflect that either was under formal arrest or the functional equivalent. (ECF No. 191, at 28:11–29:5.) In the Court's estimation, even if the facts here might meet the factual predicate to analyze the protective sweep under *Buie*'s first prong, the prudent approach would be to apply the more rigorous requirements of *Buie*'s second prong. *See White*, 748 F.3d at 511–12.

Under *Buie*'s second prong, an officer needs a "reasonable and articulable suspicion" that a hidden assailant may be present in an area before conducting the limited search allowed under the protective sweep exception. *Id.* at 511 (citing *Buie*, 494 U.S. at 334). Without "articulable facts" the officer cannot lawfully sweep the residence. *See Buie*, 494 U.S. at 334. Here, Officer McGrath and the other Scott Township police officers present at France's home possessed reasonable and articulable facts that justified their protective sweep of the residence. The initial 9-1-1 call reported six (6) armed intruders. (ECF No. 191, at 19:20–24.) When they arrived on the scene, Huellen reiterated to the officers that there were multiple armed individuals inside the

16

residence. (*Id.* at 20:21–25.) But when Officers McGrath and Helf made their initial entry into the house and moved upstairs to where they heard music playing, they only located two (2) individuals. (*Id.* at 27:19–28:6.) Officer McGrath reasonably believed, then, that at least four (4) other armed individuals might still be inside the residence. (*Id.*) In a similar vein, Officers McGrath and Helf found a firearm in the upstairs bedroom, which further convinced them of the need to perform a complete protective sweep of the house. (*Id.* at 28:11–29:5.)

The Court concludes that Officer McGrath's reasonable assessment that least four (4) additional armed individuals may have been inside the house, coupled with the discovery of two (2) individuals and a firearm in the upstairs bedroom, provided the requisite reasonable and articulable facts to justify the officers' protective sweep of France's entire house.

## C. **The Warrant**

The Warrant Clause of the Fourth Amendment provides: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause, the Supreme Court has held, must be inferred from the "totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). But there is no precise mathematical formula used to determine when probable cause exists. Instead, the Supreme Court held that probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Id.* at 236. The magistrate judge must ask whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. And a district court later reviewing the magistrate judge's probable cause determination owes an appropriate measure of deference to that decision, so long as it is supported by a substantial basis in the facts. *Id.* at 236.

Here, France's arguments with respect to the search warrant live and die by the Court's

17

conclusion as to the lawfulness of the initial warrantless entry and protective sweep of his home.[6] To the extent, however, that the sufficiency of the probable cause for the warrant is in question, the Court can quickly dispel that notion that probable cause is lacking here. A precise definition of probable cause has long escaped the courts. *See, e.g.*, *Gates*, 462 U.S. at 236. But suffice it to say that when officers observe so much suspected methamphetamine in plain view that they refuse to bring their K-9 into the home out of fear that the dog might overdose and die, then they have probable cause to obtain a search warrant. Officer McGrath's observations of the suspected narcotics and drug paraphernalia (along with a gun) readily apparent in France's home plainly provide the necessary probable cause to support the search warrant.[7] Officer McGrath properly captured his observations in his affidavit of probable cause (ECF No. 172-1), and the Court concludes that the magistrate judge had a substantial basis—and then some—for concluding that the Warrant Clause's probable cause requirement had been met.

---

[6] It would appear that the Court, having already concluded that both the initial entry and subsequent protective sweep were lawful, does not need to proceed any further. This is inferred from the arguments made by France's counsel in his motion and briefs (ECF Nos. 172, 194), and the following statement made by France's counsel during the suppression hearing:
> [There are] two parts to the motion. The one part has nothing to do with the search warrant. It has to do with the warrantless entry of the house. That is one of the main issues. Secondarily, that the search warrant that was crafted should be suppressed not because of probable cause because there was probable cause to get the search warrant. It's just that the probable cause was developed unlawfully or illegally.

(ECF No. 191, at 95:14–22.)

[7] At oral argument Defendant's counsel agreed that nothing of consequence in Officer McGrath's affidavit of probable cause stemmed from TFO Dunlevy's walkthrough of France's residence to ensure that it was not an active meth lab. (*Id.* at 95:8–13.) But to the extent that any question could be raised as to the lawfulness of TFO Dunlevy's entry into France's residence, the Court concludes that his entry and sweep was lawful. Other circuits have held that an active meth lab is an exigent circumstance for purposes of the Fourth Amendment. *Kleinholz v. United States*, 339 F.3d 674, 677 (8th Cir. 2003) ("Due to the volatile nature of [meth] labs, exigent circumstances justified an immediate but limited search."); *United States v. Rhiger*, 315 F.3d 1283, 1290–91 (10th Cir. 2003) (holding that the presence of chemicals used to produce methamphetamine, odor associated with methamphetamine, and knowledge of the "potential explosiveness of an active meth lab" presented exigent circumstances justifying a warrantless entry and search). Here, based on Officer McGrath's initial observations inside France's residence, law enforcement had a reasonable belief that the house may contain an active meth lab. The known danger of such an environment justified calling TFO Dunlevy—who as a DEA task force officer had special training in analyzing meth labs—to conduct a safety walkthrough of France's home. And like Officer McGrath's protective sweep, TFO Dunlevy's walkthrough was limited to determining whether the home was in fact an active meth lab, not gathering evidence of criminality.

18

## IV. CONCLUSION

The Court concludes that the Government demonstrated by a preponderance of the evidence that (1) the Scott Township police officers' initial warrantless entry into France's residence was lawful under the "emergency aid exception"; (2) the officers' subsequent protective sweep of France's home was lawful under *Maryland v. Buie* and its progeny; and (3) Officer McGrath's affidavit of probable cause provided a substantial basis for the magistrate judge to issue a search warrant for France's residence. For the foregoing reasons, Defendant France's Motion to Suppress Evidence (ECF No. 172), is DENIED.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: September 30, 2019

cc: All counsel of record, Defendants